**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA, ex rel.
Syed Rahman, M.D.,
<u>Plaintiff-Appellant,</u>

and

SYED RAHMAN, M.D.,
<u>Plaintiff,</u>

v.

ONCOLOGY ASSOCIATES, P.C.;
ONCOLOGY SERVICES CORPORATION;
DOUGLAS COLKITT, M.D.; JEROME
DERDEL, M.D.; JOANNE RUSSELL;
ONCOLOGY FUNDING CORPORATION;
STONEBORO ONCOLOGY ASSOCIATES,

P.C.; WARREN ONCOLOGY
ASSOCIATES, P.C.; PHOENIXVILLE
ONCOLOGY ASSOCIATES, P.C.;
LITTLESTOWN ONCOLOGY ASSOCIATES,
P.C.; LEHIGHTON ONCOLOGY
ASSOCIATES, P.C.; EXTON ONCOLOGY
ASSOCIATES, P.C.; BUCKS COUNTY
ONCOLOGY ASSOCIATES, P.C.;
GREENBELT CANCER TREATMENT
CENTER, L.P.; ATLANTIC RADIATION
ONCOLOGY L.L.C.; DERDEL
RANDALLSTOWN ONCOLOGY
ASSOCIATES, P.C.; ATLANTIC
RADIATION ONCOLOGY ASSOCIATES,
P.C.; DERDEL UNION MEMORIAL

No. 99-1905

ONCOLOGY ASSOCIATES, P.C.; DERDEL RIVERSIDE ONCOLOGY ASSOCIATES, P.C.; DERDEL CHESAPEAKE ONCOLOGY ASSOCIATES, P.C.; OKEECHOBEE ONCOLOGY ASSOCIATES, P.A.; KEY WEST ONCOLOGY ASSOCIATES, P.A.; TAMPA ONCOLOGY ASSOCIATES, P.A.; TREASURE COAST ONCOLOGY ASSOCIATES, P.A.; LAUDERDALE LAKES ONCOLOGY, P.A.; ST. LAWRENCE ONCOLOGY, P.C.; LIBERTY ONCOLOGY ASSOCIATES, P.C.; COMMUNITY RADIATION THERAPY ASSOCIATES, P.C.; KINGS PLAZA RADIOLOGY, P.C.; SOUTHERN NEW JERSEY CANCER TREATMENT; WILLIAMS COUNTY ONCOLOGY ASSOCIATES, P.C.; PARK ONCOLOGY ASSOCIATES, P.C.; PARKS ONCOLOGY ASSOCIATES, INCORPORATED; GHCC INCORPORATED f.k.a. GREATER HARRISBURG CANCER CENTER, INCORPORATED; MGH CANCER TREATMENT CENTER, L.P.; ONCOLOGY SERVICES CORPORATION OF LAWNWOOD; KEYS CANCER CENTER LIMITED PARTNERSHIP; XCC, INCORPORATED; GPCC, INCORPORATED; IRCC, INCORPORATED; KRTC, INCORPORATED; LVCC, INCORPORATED; MGHCC, INCORPORATED; MHCC, INCORPORATED; MARYLAND GENERAL CANCER CENTER, INCORPORATED; ST. LUCIE COUNTY RADIATION ONCOLOGY,

2

LIMITED; ONCOLOGY ASSOCIATES, PC/INDIANA; ONCOLOGY ASSOCIATES, PC/ALBEMARLE; DERDEL MARYLAND GENERAL ONCOLOGY ASSOCIATES, PC; DERDEL MGH ONCOLOGY ASSOCIATES, PC; KANKAKEE ONCOLOGY ASSOCIATES, PC; ONCOLOGY ASSOCIATES, PC/HARRISBURG; PLEASANT HILLS ONCOLOGY ASSOCIATES, PC; ONCOLOGY ASSOCIATES, PC/LEBANON; ONCOLOGY ASSOCIATES, PC/SALISBURY; FLAGSTAFF ONCOLOGY ASSOCIATES, PC; FORT PIERCE ONCOLOGY ASSOCIATES, PC; GREENWAY ONCOLOGY ASSOCIATES, PC; GREATER PITTSBURGH ONCOLOGY ASSOCIATES, PC; NORTHWEST RADIATION TREATMENT SERVICES, INCORPORATED; MARLTON ONCOLOGY, PC; RANDALLSTOWN ONCOLOGY CENTER, INCORPORATED; WESTCHESTER ONCOLOGY, PC; CHESAPEAKE REGIONAL CANCER CENTER, INCORPORATED; UNION MEMORIAL ONCOLOGY CENTER, INCORPORATED; WILLIAMS COUNTY ONCOLOGY ASSOCIATES, INCORPORATED; TRI-STATE ONCOLOGY ASSOCIATES, INCORPORATED; HERITAGE HILLS MEDICAL, LP; RIVERSIDE ONCOLOGY; JEFFERSON RADIATION ONCOLOGY CENTER, LP; ALBEMARLE REGIONAL CANCER CENTER, LP; BROWARD RADIATION THERAPY CORPORATION;

3

LAKE OKEECHOBEE CANCER CENTER, INCORPORATED; LAWNWOOD REGIONAL CANCER CENTER, LP; ONCOLOGY SERVICES CORPORATION OF KEY WEST, INCORPORATED; ONEONTA RADIATION ONCOLOGY, PC; ONCOLOGY SERVICES CORPORATION OF TAMPA, INCORPORATED; GREENBELT CANCER TREATMENT CENTER; BILLING SERVICES, INCORPORATED; NATIONAL MEDICAL FINANCIAL SERVICES CORPORATION; COLKITT ONCOLOGY GROUP, INCORPORATED; EQUIMED, INCORPORATED;

Defendants-Appellees,

and

GREATER HARRISBURG CANCER CENTER, INCORPORATED; ONCOLOGY ASSOCIATES, PC/LIFE CARE; ONCOLOGY ASSOCIATES, PC/HERITAGE HILLS; ONCOLOGY ASSOCIATES, PC/PITTSBURGH; CANCER CENTER OF NORTHERN ARIZONA PTR; SALISBURY RADIATION ONCOLOGY CENTER, INCORPORATED; MEDTREND HEALTH SYSTEMS, INCORPORATED; ST. LAWRENCE ONCOLOGY, PC/OGDENSBURG; PMCB, INCORPORATED; ST. LAWRENCE ONCOLOGY, PC/BROOKLYN; SKYLINE ONCOLOGY ASSOCIATES, P.C. PITTSBURGH, PA; MALONE ONCOLOGY ASSOCIATES, P.C., STATE COLLEGE, PA; NIXON EQUIPMENT CORPORATION, a corporation formed under the laws of Nevis State College, PA;

4

THOMAS JEFFERSON REAL ESTATE
CORPORATION, a corporation formed
under the laws of Nevis State
College, PA; GEORGE WASHINGTON
REAL ESTATE CORPORATION, a
corporation formed under the laws
of Nevis State College, PA;
OAKTREE CANCER CARE,
INCORPORATED, PITTSBURGH, PA;
KEYSTONE ONCOLOGY, LLC, STATE
COLLEGE PA; EASTERN PENNSYLVANIA
ONCOLOGY, LLC; MASSACHUSETTS
RADIATION ONCOLOGY SERVICES, P.C.;
CHESTER COUNTY ONCOLOGY, LLC;
ROSEWOOD CANCER CARE,
INCORPORATED; FLORIDA ONCOLOGY,
P.A.; COASTAL ONCOLOGY, LLC,
Defendants,

v.

HIGHMARK, INCORPORATED dba XACT
MEDICARE SERVICES; NORIDIAN
MUTUAL INSURANCE COMPANY dba
BLUE CROSS BLUE SHIELD OF NORTH
DAKOTA; AETNA INCORPORATED; BLUE
CROSS BLUE SHIELD OF FLORIDA;
HEALTH CARE SERVICE CORPORATION,
A Mutual Legal Reserve Company;
TRAILBLAZER HEALTH ENTERPRISES,
LLC; BLUE CROSS BLUE SHIELD OF
MARYLAND, INCORPORATED; EMPIRE
BLUE CROSS AND BLUE SHIELD;
GROUP HEALTH INCORPORATED; BLUE
CROSS AND BLUE SHIELD OF WESTERN
NEW YORK, INCORPORATED; CIGNA

5

CORPORATION; CONNECTICUT GENERAL
LIFE INSURANCE COMPANY;
NATIONWIDE MUTUAL INSURANCE
COMPANY,
Third-Party Defendants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-95-2241-H)

Argued: September 22, 1999

Decided: December 14, 1999

Before WIDENER and NIEMEYER, Circuit Judges, and
James H. MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Niemeyer wrote the opinion, in which Judge Widener and
Senior Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Dana Joan Martin, Appellate Staff, Civil Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellant. Paul Mark Sandler, FREISHTAT & SANDLER,
Baltimore, Maryland, for Appellees. **ON BRIEF:** David W. Ogden,
Acting Assistant Attorney General, Lynne A. Battaglia, United States
Attorney, Mark B. Stern, Appellate Staff, Civil Division, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellant.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The defendants in this case, who are radiation oncology service providers, obtained a writ of mandamus from the district court, compelling the United States (the Health Care Financing Administration ("HCFA")) and its administering contract carriers to proceed promptly with the administrative process established for processing providers' Medicare Part B reimbursements. The United States had suspended the administrative process pending judicial determination in this case of whether the oncology service providers defrauded HCFA and whether they are entitled to reimbursement.

We affirm the district court's writ of mandamus insofar as it requires HCFA and its contract carriers to proceed with the administrative process established by regulation without regard to the progress of this action, but we reverse the district court's requirement that they accomplish the next step in the administrative process -- that of making overpayment determinations as provided by 42 C.F.R. § 405.372(c) -- within 20 days.

I

The United States filed its complaint in this case against Dr. Douglas Colkitt; his wife; his business partner, Dr. Jerome Derdel; and more than 80 healthcare entities owned, operated, or controlled by Colkitt, which provide diverse healthcare services in the field of radiation oncology. The complaint, as amended, alleges that the defendant oncology service providers engaged in fraudulent billing schemes involving the Medicare Part B program during the 1992-1997 period and the CHAMPUS program (the Medicare counterpart for the uniformed services) during the 1992-1996 period, causing losses to these programs in excess of $12 million. Specifically, the United States alleges that the defendants claimed reimbursement on bills for radiation oncology services that were neither provided nor ordered by the physician and on bills for unnecessary radiation oncology services, and that the defendants misrepresented the medical services rendered in order to obtain both higher and double reimbursements for services.

7

Before this action was commenced, some of these oncology service providers had applied to the Medicare Part B program for reimbursement of more than $2 million in services that HCFA had directed its carriers to suspend because of HCFA's suspicion of fraud. In particular, HCFA suspended various reimbursement payments to some 23 of the defendant Medicare providers on October 8, 1998, December 18, 1998, and March 16, 1999, totaling approximately $2.2 million. The Department of Justice ("DOJ"), which filed this action on behalf of the United States, took the position that the administrative process should be suspended until judgment was reached in this action because the administrative forum was neither intended nor sufficient to deal with cases of Medicare fraud. As a result, the contract carriers -- private insurance companies under contract with HCFA to process claims for Medicare reimbursement, see infra Part IV.A -- took no further steps in the administrative process, which includes the critical determination of the amount of overpayment, a step that is a condition precedent to the providers' right to challenge HCFA's position through the administrative process. See 42 C.F.R. § 405.801. The administrative process has accordingly come to a halt. At oral argument, the United States conceded that it has stayed the administrative proceedings pending the outcome of this litigation. The United States also took this position before the district court ("It is the Agency's position that to make [the overpayment determinations] requires information that's coming out in this False Claims Act case").

On April 28, 1999, the defendants filed a motion for a writ of mandamus in this action, then pending before the district court, to compel HCFA and its contract carriers to lift the reimbursement payment suspensions, or alternatively, to issue overpayment determinations. The defendants also requested that the DOJ "immediately cease all interference in any audits by Medicare carriers which involve Defendants." Following a hearing on June 11, 1999, the district court issued an order dated June 21, 1999, granting in part and denying in part the defendants' motion for a writ of mandamus. The court concluded that "Defendants are entitled to the entry of an order directing the HCFA and the carriers to promptly make overpayment determinations mandated by § 405.372(c) so that defendants may go forward with the administrative process to which they are entitled under the applicable regulations." The court reasoned that there are no exceptions to the administrative procedures applicable when a suit under the False

8

Claims Act is pending in federal court and that there is no reason why parallel administrative and judicial proceedings cannot go forward at the same time. The court concluded that, by suspending the administrative process, the United States was merely "expressing its disagreement with the administrative procedures mandated by the regulation." The court directed the United States and its contract carriers "to make said overpayment determinations within 20 days from the date of this Order."

The United States filed this appeal, and we stayed the district court's writ of mandamus pending its resolution. On appeal, the United States contends that (1) the defendants failed to satisfy procedural requirements for issuance of the writ of mandamus; and (2) in any event, the defendants have not satisfied the conditions for issuance of the writ by demonstrating that they have a clear right to the relief sought and that they have no other adequate remedy. The defendants moved to dismiss this appeal, contending that we lack jurisdiction to review the writ of mandamus as an interlocutory order.

II

At the outset, we must address the defendants' motion to dismiss this appeal, alleging that we are without jurisdiction to review an interlocutory mandamus order. The defendants contend that 28 U.S.C. § 1292(a)(1), on which the United States relies, provides no basis for the appeal of an order that is not an injunction.

Section 1292(a)(1) confers jurisdiction on courts of appeals to review interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." Thus, the statutory language does not in haec verba authorize the interlocutory appeal of orders granting a writ of mandamus. But this does not mean that a writ of mandamus does not, in particular circumstances, amount to an injunction reviewable under§ 1292(a)(1). An order entitled "injunction" must, by definition, prohibit or command specific conduct. A writ of mandamus may serve the same office, commanding the performance of a specified official act or duty; indeed, the Latin word "mandamus" means"we command." But, of course, not all orders commanding conduct are injunctions of the type that Congress intended to make appealable under

9

§ 1292(a)(1). For example, an order compelling discovery involves an interlocutory command that may be subject to the contempt power of the court, yet such an order is not thought to be cognizable under § 1292(a)(1). See 16 Wright, Miller & Cooper, Federal Practice and Procedure § 3922.2, at 97-102 (1996).

The Supreme Court has held that § 1292(a)(1) provides appellate jurisdiction not only for the review of orders that grant or deny injunctions but also for the review of "orders that have the practical effect of granting or denying injunctions" and that are of "serious, perhaps irreparable, consequence." Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 287-88 (1988) (internal quotation marks and citations omitted). The Court had earlier delineated two essential requirements for determining whether an order in the nature of an injunction should be appealable as an interlocutory order under 1292(a)(1): that the order be of "serious, perhaps irreparable, consequence" and that it can be "effectually challenged" only by immediate appeal. Carson v. American Brands, Inc., 450 U.S. 79, 84 (1981); see also NationsBank Corp. v. Herman, 174 F.3d 424, 427 n.1 (4th Cir. 1999) (stating that "in Carson, the Supreme Court set forth the standard governing appeals of interlocutory orders that have effects similar to those of injunctions, but that technically are not injunctions"), petition for cert. filed, 63 U.S.L.W. 3154 (U.S. Sept. 1, 1999) (No. 99-394). See generally 16 Wright, Miller & Cooper, Federal Practice and Procedure § 3922, at 69-70 (1996).

In this case, the United States argues that the writ of mandamus, if left standing, will have a serious and irreparable consequence that will not be effectively appealable at a later time. The United States notes that, because of the nature of the alleged fraud in this case, it cannot issue an informed overpayment determination within the time constraints provided, with the consequence that money might be released to the defendants and later might not be recoverable. The United States alleges that the defendants have already disposed of assets and moved money to the Caribbean island of Nevis. See United States v. Oncology Associates, P.C., No. 99-1979, ___ F.3d ___(4th Cir. Nov. 8, 1999) (affirming district court's authority to enter preliminary injunction freezing defendants' assets in this case in the face of reorganizations and transfers of assets by defendants).

10

On its argument that an immediate appeal is necessary, the United States observes that if it is required to comply with the writ of mandamus and issue inaccurate overpayment determinations, its ability to correct the determinations would be limited. While the United States can reopen overpayment determinations administratively, see 42 C.F.R. § 405.841, it cannot, by regulation, appeal any final administrative action to the courts. The defendants, by contrast, are entitled to seek judicial review. See 42 U.S.C. § 1395ff(b); cf. Bender v. Clark, 744 F.2d 1424, 1428 (10th Cir. 1984).

We agree with the United States that premature overpayment determinations, made on an abbreviated timetable, could have serious and irreparable consequences and could effectively be challenged only by immediate appeal. Irreparable harm is shown where there is a reasonable danger that money and assets sought by the United States would be concealed or moved beyond reach of the government. Once assets are lost, any effort to redress erroneous overpayment determinations would, as a practical matter, become futile.

Accordingly, we conclude that the district court's writ of mandamus has "the practical effect" of granting an injunction and therefore is appealable under 28 U.S.C. § 1292(a)(1). See Gulfstream Aerospace, 485 U.S. at 287-88.

III

Claiming first that the defendants have not met the procedural prerequisites for a writ of mandamus, the United States contends (1) that a writ of mandamus may not be granted in a pending action, but rather must be sought in a separate action; (2) that the writ must identify the specific government officers against whom mandamus relief is sought and be served on them; and (3) that an action for mandamus relief filed under 28 U.S.C. § 1361 may not issue against private carriers who have not been made parties. We address these in order.

A

First, the United States contends that mandamus relief may not be granted in a pending action, but must be sought in a separate action.

11

While the common-law writ of mandamus authorizes an independent action at law for mandamus relief, this does not preclude a request for mandamus relief in an action seeking other relief. Nor does the language of 28 U.S.C. § 1361, which confers jurisdiction over "any action in the nature of mandamus" (emphasis added), require that a separate action be filed. On the contrary, the modern trend in civil pleading has been to encourage that all claims for relief be brought in a single suit. See Fed. R. Civ. P. 2 (providing that under federal procedure, all remedies in law or equity may be sought in "one form of action" known as a "civil action"); Fed. R. Civ. P. 8(a) (providing that in a civil action, relief "of several different types may be demanded"). We have previously entertained appeals on the merits, coupled with petitions for a writ of mandamus. See, e.g., Shives v. CSX Transp. Inc., 151 F.3d 164 (4th Cir.) (entertaining both an appeal from a final judgment and a petition for a writ of mandamus in the same action), cert. denied, 119 S. Ct. 547 (1998); cf. Kerr v. United States Dist. Court for the N. Dist. of Cal., 426 U.S. 394, 396-401 (1976) (entertaining a petition for a writ of mandamus to review trial court's discovery order); Schlagenhauf v. Holder , 379 U.S. 104, 108-09 (1964) (entertaining a petition for a writ of mandamus to review trial court's order that the defendant in a personal injury suit undergo mental and physical examinations).

Accordingly, we conclude that the district court did not err by entertaining a motion for a writ of mandamus in the context of a pending action.

B

The United States also argues that specific United States officers need to be identified and served with the writ of mandamus. We likewise conclude that this argument lacks merit since it fails to recognize that because HCFA filed this action, it is already before the court and is subject to court orders. And while no specific officer in HCFA is named in the writ issued by the district court, HCFA, which is an agency of the United States with defined responsibilities and which may be sued, is named.

Just as at common law where writs of mandamus can issue against corporations that have a public duty, see, e.g. , Northern Pac. R.R. v.

12

Dustin, 142 U.S. 492, 499 (1892) ("If . . . the charter of a railroad corporation expressly requires it to maintain its railroad as a continuous line, it may be compelled to do so by mandamus"), so too a writ can issue against any entity that is itself given a clear public duty to act. HCFA has clearly defined responsibilities in administering the Medicare Part B program, and the agency is organized in a manner that identifies the accountability of its employees. While the chief executive officer of a corporation, in lieu of the corporation, could be named in a mandamus writ, a writ naming only a corporation does not become invalid by virtue of that omission. Like a corporation, HCFA is suable, and its organizational structure provides accountability. HCFA's status under 42 C.F.R. § 421.5(b) as the real party in interest in any litigation involving the administration of the Medicare Part B program also justifies the district court's naming it as the responsible party for carrying out the duties prescribed by the writ of mandamus, without naming persons or carriers. See 42 C.F.R. § 421.5(b) ("carriers act on behalf of HCFA in carrying out certain administrative responsibilities that the law imposes . . . .[A]nd HCFA is the real party of interest in any litigation involving the administration of the program"). Moreover, HCFA is the agency that at the request of the DOJ has stayed the administrative processing of the defendants' application for reimbursement, and neither HCFA nor the DOJ asserts any doubt about what would be required of HCFA if the writ of mandamus is enforced.

The United States also argues that 28 U.S.C. § 1361, which refers to mandamus actions filed against "an officer or employee of the United States or any agency thereof," precludes entry of the writ against an agency. But this argument reveals a misunderstanding of the writ of mandamus and of the office of the statute. Section 1361, together with 28 U.S.C. § 1391(e), was enacted as the Mandamus and Venue Act of 1962 to confer jurisdiction and venue to entertain mandamus actions against government officials responsible for federal administrative action in locations other than Washington, D.C. See Clark Byse & Joseph V. Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L. Rev. 308, 318-19 (1967). Thus, the language of § 1361, far from imposing the restrictive procedural requirements urged by the United States, simply recognizes the common-law writ and provides the basis, when federal actors are

13

involved, for federal jurisdiction over an action based on the writ. See id. at 319 ("[S]ection 1361 . . . does not restrict the availability or scope of judicial review that could have been obtained had section 1361 not been enacted"). Indeed, in this case, where federal jurisdiction is based on 28 U.S.C. § 1345 because the United States commenced the action, § 1361 is not needed to provide a jurisdictional basis for the mandamus writ that issued, even though the district court did rely on § 1361.

C

Finally, the United States asserts as a procedural matter that 28 U.S.C. § 1361 does not authorize the writ of mandamus to issue against private parties, such as HCFA's contract carriers, who have not even been served with process. While it is true that § 1361 is limited to an "officer or employee of the United States or any agency thereof," that constraint is necessary only to justify federal jurisdiction. Section 1361 does not purport to narrow the scope of the common-law writ, which presumably could be issued on a jurisdictional basis other than § 1361. See Byse & Fiocca, Section 1361 of the Mandamus and Venue Act, 81 Harv. L. Rev. at 311-13.

The common-law writ of mandamus is not limited to a particular type of person, but is characterized by its authorization to command performance of a specified official act or duty. Blackstone defines the writ as follows:

> A writ of mandamus is, in general, a command issuing in the king's name from the court of king's bench, and directed to any person, corporation or inferior court of judicature within the king's dominions, requiring them to do some particular thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or at least supposes, to be consonant to right and justice.

3 William Blackstone, Commentaries *110. As we noted above, the writ may issue to private persons or corporations that have a clear public duty. See Northern Pac. R.R., 142 U.S. at 499; see also Stern v. South Chester Tube Co., 390 U.S. 606, 608-09 (1968). Thus, the

14

question is not whether the contract carriers are private or public entities, but rather whether they are responsible for carrying out an official act or duty. See Your Home Visiting Nurse Servs., Inc. v. Secretary of Health and Human Servs., 132 F.3d 1135, 1141-42 (6th Cir. 1997) ("Although [HHS] has discretion over whether to allow reopenings, the proper question is whether . . . the fiscal intermediary had a nondiscretionary duty to reopen pursuant to[HHS's] regulations and interpretations thereof"[1] ), aff'd, 119 S. Ct. 930 (1999).

Not only are the contract carriers for the Medicare Part B program given a clear duty to perform official acts in administering the program, they are actually considered "officers or employees" of the United States within the meaning of the Medicare Act. See Your Home Visiting Nurse Servs., Inc. v. Shalala, 119 S. Ct. 930, 935 (1999) (determining that judicial review of fiscal intermediary's refusal to reopen a reimbursement determination was precluded by 42 U.S.C. § 405(h), which provides that "[n]o action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under Section 1331 or 1346 of Title 28 to recover on any claim arising under [the Medicare Act]"); Bodimetric Health Servs., Inc. v. Aetna Life & Cas. , 903 F.2d 480, 487-88 (7th Cir. 1990) (holding that suits against fiscal intermediaries are governed by the terms of § 405(h) as "officers or employees" of the United States).

Thus, HCFA's contract carriers, while not parties to this action because HCFA is the real party in interest, are in privity with HCFA and therefore are bound by orders directed at "HCFA and its carriers," provided they have actual notice of the court's order. Cf. Fed. R. Civ. P. 65(d) (injunctions binding on "parties and persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise").

_____

[1] "Fiscal intermediaries," which are contract carriers administering the Medicare Part A program, are comparable to the contract carriers administering the Medicare Part B program. See infra  note 2.

15

IV

On the merits, the United States contends that the defendants failed to make the requisite substantive showing for issuance of a writ of mandamus.

The conditions for the issuance of the writ are generally settled. The mandamus remedy is a "drastic one" reserved for "extraordinary situations" involving the performance of official acts or duties. Kerr v. United States Dist. Court for the N. Dist. of Cal., 426 U.S. 394, 402 (1976); see also Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289 (1988). Accordingly, as a condition for issuance of the writ, the party seeking it must satisfy "the burden of showing that his right to issuance of the writ is clear and indisputable." Kerr, 426 U.S. at 403 (internal quotation marks and citations omitted). To that end, he must demonstrate not only that he has a clear right to the relief sought but also that the responding party has a clear duty to perform the act amounting to the relief sought. See In re First Fed. Sav. & Loan Ass'n of Durham, 860 F.2d 135, 138 (4th Cir. 1988). As a "wildcard remedy" -- "it issues in all cases where the party hath a right to have anything done, and hath no other specific means of compelling its performance," 3 Blackstone, at *110-- the petitioner must demonstrate that he has "no other adequate means to attain the relief he desires." Kerr, 426 U.S. at 403; see also First Fed. Sav. & Loan, 860 F.2d at 138. While the writ is recognized at law, it is administered with equitable principles in the interest of justice and at the discretion of the issuing court. Kerr, 426 U.S. at 403; United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543 (1937) (the right to the writ "may turn on equitable considerations").

In short, to establish the conditions necessary for issuance of a writ of mandamus, the party seeking the writ must demonstrate that (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances. See Kerr, 426 U.S. at 403; Estate of Michael ex rel. Michael v. Lullo, 173 F.3d 503, 512-13 (4th Cir. 1999); First Fed. Sav. & Loan, 860 F.2d at 138; 3 Blackstone, at *110-111.

16

Against these background principles, the United States contends that the defendants have not demonstrated a right to relief because they have failed to establish that HCFA has a clear duty to issue over-payment determinations within 20 days, as ordered by the district court. On the contrary, the United States argues, the time frames specified by regulation give HCFA discretion when to act, and this discretion does not form the basis for finding a clear right in the defendants. The United States also contends that the defendants have failed to establish that there are no other adequate means to attain the relief desired. On the contrary, the United States maintains, the defendants have failed to follow the prescribed administrative framework by refusing to wait for the requisite agency overpayment determinations and thereafter to appeal them within the agency through processes established by regulation.

We address these two contentions after describing briefly the administrative process for reviewing claims for reimbursement under the Medicare Part B program.

A

The "Supplementary Medical Benefits Program for the Aged and Disabled" under 42 U.S.C. § 1395j-w, established by Part B, Title XVIII, of the Social Security Act (the Medicare Part B program), is administered by the Department of Health and Human Services, which has delegated Part B administration to its component agency, HCFA. HCFA administers reimbursement of Part B benefits, which are paid from the Federal Supplementary Medical Insurance Trust Fund. HCFA contractually assigns the task of processing and paying Part B benefits to private insurance carriers (or"contract carriers") as authorized by 42 U.S.C. § 1395u. While HCFA remains the real party in interest in any litigation involving the administration of the Medicare program by a carrier, the carrier is HCFA's agent.**2** See 42 C.F.R. § 421.5(b).

_____

**2** Under the Medicare Act, a "carrier" is a private insurance company that contracts with the Department of Health and Human Services to administer claims submitted under the Medicare Part B program, while a "fiscal intermediary" is a private insurance company that contracts with

17

Individual Medicare Part B enrollees may assign their right to Medicare Part B benefits to their healthcare providers, see 42 U.S.C. § 1395u, who in turn apply to HCFA for reimbursement. When a healthcare provider submits a claim for reimbursement to HCFA, the contract carrier will reimburse the provider after determining that the claim is appropriate. When a contract carrier determines, however, that either all or part of a claim submitted by a healthcare provider is incorrect or is unwarranted, the carrier may suspend payment to the healthcare provider in order to determine the amount of any overpayment that is claimed. See 42 C.F.R. §§ 405.371-.372. But with a suspension of payment, the carrier must take "timely action" to "obtain the additional evidence it may need to make a determination as to whether an overpayment exists . . . [and] make[ ] all reasonable efforts to expedite the determination." 42 C.F.R.§ 405.372(c). A suspension of payment to a provider is limited to 180 days, after which a one-time extension of an additional 180 days may be obtained. See 42 C.F.R. § 405.372(d). These specific time limits may be extended by HCFA or waived altogether only if the DOJ requests HCFA to continue its suspension "based on the ongoing investigation and anticipated filing of criminal and/or civil actions" or if the Office of Inspector General is considering the case for administrative action. See 42 C.F.R. § 405.372(d)(3).

When a healthcare provider is dissatisfied with a contract carrier's overpayment determination, the provider may request the carrier to review the decision, see 42 C.F.R. § 405.807, or may seek administrative review and hearing by the Secretary of the Department of Health

_____

the Department of Health and Human Services to administer major medical claims under the Medicare Part A program. Fiscal intermediaries and carriers perform comparable roles. See S. Rep. 89-404, reprinted in 1965 U.S.C.C.A.N. 1943, 1995 ("In the performance of their contractual undertakings, the carriers and fiscal intermediaries. . . act on behalf of the Secretary, carrying on for him the governmental administrative responsibilities imposed by the bill"). Courts have treated them in the same way. See United States v. Blue Cross & Blue Shield of Ala., Inc., 156 F.3d 1098, 1106 n.17 (11th Cir. 1998) (Carrier is "the Part B equivalent of a fiscal intermediary"); United States v. Suba, 132 F.3d 662, 665 n.4 (11th Cir. 1998) ("Fiscal intermediaries and carriers are government contractors who administer payments to health care providers").

and Human Services, see 42 U.S.C. § 1395ff(b). After exhausting administrative procedures, the healthcare provider may seek judicial review pursuant to the mechanisms provided by the Social Security Act, 42 U.S.C. § 405(g). See 42 U.S.C.§ 1395ff(b). Although the United States has authority to reopen certain decisions within the administrative process, see 42 C.F.R. § 405.841, the regulations do not allow the United States to obtain review of an administrative decision in the courts; only a healthcare provider dissatisfied with a carrier's initial determination may continue to appeal an adverse decision to the courts. The statutes and regulations governing the Medicare Part B program, however, do not preclude the United States from bringing an independent action in federal court to litigate claims under statutes such as the False Claims Act, 31 U.S.C. § 3729 et seq., the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et seq., or related common-law claims, as was done in this case.

B

The United States contends that these administrative procedures do not provide the defendants with a clear and indisputable right to receive overpayment determinations within 20 days, as ordered by the district court in its writ of mandamus ("the HCFA and the carriers are hereby directed to make said overpayment determinations within 20 days from the date of this Order [June 21, 1999]"). This contention raises two questions: (1) whether the defendants have a clear right to overpayment determinations, and (2) whether the defendants have a clear right to any such determinations within 20 days.

We have no doubt that the regulations provide the defendants with the clear right to a "timely" overpayment determination. When a HCFA contract carrier suspends a reimbursement payment to a healthcare provider, the regulations clearly anticipate the suspension to be temporary, pending an overpayment determination. See 42 C.F.R. §§ 405.371-.372. The suspension is designed to enable the contract carrier "to obtain the additional evidence it may need to make a determination as to whether an overpayment exists or the payments may be made." 42 C.F.R. § 405.372(c). Once the determination is made, the carrier is required to inform the healthcare provider and, "if appropriate," rescind the suspension of payment or adjust the provider's claim "to take into account the `overpayment' determination." 42

19

C.F.R. § 405.372(c). Once the carrier makes the required determination, a healthcare provider dissatisfied with the decision can then seek further review within the administrative process.

The United States does not dispute that the defendants are entitled to overpayment determinations. It argues, rather, that because of the complexity of the alleged fraud in this case, the agency cannot effectively and accurately make the overpayment determinations and that the discovery and fact-finding mechanisms provided by the judicial process will assist in that effort. It argues essentially that it is entitled to defer the overpayment determinations pending the outcome of this litigation under the authority of 42 C.F.R. § 405.372(d)(3)(ii), which provides that HCFA may grant an unspecified extension of time to make an overpayment determination "if the Department of Justice submits a written request to HCFA that the suspension of payment be continued based on the ongoing investigation and anticipated filing of criminal and/or civil actions."

The difficulty with this argument is that it fails to recognize the respective roles of the administrative process and the courts in any parallel judicial action. Section 405.372(d)(3) provides that the administrative process may be delayed pending an "ongoing investigation." The United States' argument, however, would substitute "ongoing parallel litigation" for "ongoing investigation." Indeed, it concedes that the prosecution of this action essentially amounts to its investigation. The United States would thus have the outcome of this judicial proceeding provide the basis for the overpayment determination required by 42 C.F.R. § 405.372.

To incorporate this judicial action into the administrative process, however, would not only contravene the language of the regulation itself, but would also create an impossible scenario that would obliterate much of the administrative process. If HCFA, in order to make the overpayment determination, were entitled to await the outcome of this action to obtain a judicial determination of whether and to what extent the defendants committed fraud, it would be inserting a judicial determination into the administrative process for evaluation and application as HCFA would determine appropriate. In addition, at the end of that administrative process, the court providing judicial review would be put into a confrontational position, squaring off with the courts in

20

this case that reached the decisions that HCFA incorporated into the administrative process. Surely, the Department of Health and Human Services, in drafting its regulations, did not have in mind the possibility that HCFA would review judicial decisions and force reviewing courts to square off with other courts issuing those decisions. To avoid such an unseemly scenario, the United States would be forced to recognize that any determination made in this case would trump any further administrative process designed to make similar determinations, thus eliminating any further administrative review.

For these reasons, we reject the United States' suggestion that the decision in this case should form the basis for further administrative determinations, and therefore we readily conclude that the defendants have identified a clear right in the regulations to have overpayment determinations made by HCFA regardless of the progress in this case. These determinations should be made in accordance with the specified administrative process without the delay imposed by the prosecution of this parallel action. Like the district court, we perceive no reason why the administrative and judicial processes cannot proceed on parallel tracks. Nowhere do the regulations authorize HCFA to postpone an overpayment determination pending the outcome of judicial inquiry into the presence of fraud. It may be that the two routes will ultimately yield different determinations of the amount, if any, of the defendants' fraud, but mechanisms for review exist in both venues.

While it may be, as the United States asserted at oral argument, that HCFA is not equipped by regulation to make determinations regarding complex fraud, this weakness in the administrative process does not relieve the United States of its obligation to follow existing regulatory procedures. The United States certainly may seek to amend the regulations, but it is not excused from compliance with them. See, e.g., In re Sabin Oral Polio Vaccine Prod. Liab. Litig., 984 F.2d 124, 127 (4th Cir. 1983) (concern over public's reaction to amendment of regulations "cannot justify the violation of the regulations" where agency "elected to take other actions which they deemed to be safe, rather than seek amendments to the regulations").

We agree with the United States, however, that these overpayment determinations need not be made within 20 days. The regulations pro-

21

vide that a suspension of payment can last 180 days, beginning with the date the suspension begins, and that the carrier may obtain an additional 180-day extension "if it is unable to complete its examination of the information or investigation" within the original 180-day time limit provided. See 42 C.F.R. § 405.372(d) (1), (2). The regulations nowhere specify a situation in which HCFA must reach its determination in fewer than 360 days. Even the 360-day limit, however, may be extended indefinitely if the DOJ requests that HCFA suspend its determination "based on the ongoing investigation and anticipated filing of criminal and/or civil actions." 42 C.F.R. § 405.372(d)(3). The United States acknowledges that to date it has not made such a request. But even in the absence of a request from the DOJ, the 360-day period has not elapsed with respect to two of the suspensions. Thus, while the district court could compel the administrative process to proceed, it abused its discretion in mandating that HCFA and its carriers provide this determination within 20 days.

C

The United States also contends that mandamus relief is not available because other adequate means to attain the relief exist. In other words, it argues that the defendants cannot avail themselves of judicial relief when they are given an administrative process to follow.

This argument blinks the procedural reality. The defendants seek judicial relief here not to circumvent the administrative process, but to compel its resumption. The very reason that the defendants have not completed the administrative process is that HCFA has refused to investigate, much less issue, overpayment determinations until this action is concluded.

Although it is well established that a plaintiff must exhaust administrative remedies before seeking judicial review and that the existence of such administrative procedures will preclude the issuance of a writ of mandamus, we conclude that in this case the administrative process normally available is not accessible to the defendants because HCFA "will not act on the claims presented to[it]." Hopewell Nursing Home, Inc. v. Schweiker, 666 F.2d 34, 42 (4th Cir. 1981); cf. McDonald v. Centra, Inc., 946 F.2d 1059, 1063 (4th Cir. 1991)

22

(exhaustion requirement excused where "the resort to administrative procedures would be futile"); Starnes v. Schweiker, 715 F.2d 134, 142 n.6 (4th Cir. 1983), vacated, 467 U.S. 1223 (1984) ("[M]andamus jurisdiction [is] unavailable to those plaintiffs who fail[ ] to exhaust administrative remedies, absent a showing that the Secretary frustrated exhaustion by failing to act on the plaintiff's administrative claims").

In this case, the United States has acknowledged that it has not acted on the defendants' overpayment determinations because the judicial process is not complete. We conclude that this constitutes an adequate showing that no other adequate means exist for the relief sought, fulfilling the fourth prerequisite for obtaining mandamus relief.

V

For the reasons given, we affirm the district court's writ of mandamus to the extent that it requires HCFA and its contract carriers to make overpayment determinations and reverse to the extent that the writ requires compliance within 20 days. We remand to the district court to permit it to modify the writ to conform the timing of overpayment determinations to the requirements of the applicable regulations.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

23