PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: DANIEL BRAXTON, Warden,
Sussex I State Prison; MARK L.
EARLEY, Attorney General of
Virginia; SAMUEL H. COOPER, Clerk,
Accomack County Circuit Court,
                    *Petitioners.*

No. 01-1

BRIAN LEE CHERRIX,
                    *Petitioner-Appellee,*

v.

DANIEL BRAXTON, Warden, Sussex I
State Prison,
                    *Respondent-Appellant.*

No. 01-2

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-00-1377-AM)

Argued: June 5, 2001

Decided: July 9, 2001

Before MOTZ, TRAXLER, and KING, Circuit Judges.

_____

Appeal dismissed and petition for mandamus denied by published
opinion. Judge King wrote the opinion, in which Judge Motz joined.
Judge Traxler wrote a concurring opinion.

_____

**COUNSEL**

**ARGUED:** Pamela Anne Rumpz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Michele Jill Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Robert L. Jenkins, Jr., BYNUM & JENKINS, P.L.L.C., Alexandria, Virginia; Peter Neufeld, Barry Scheck, The Innocence Project, BENJAMIN CARDOZO SCHOOL OF LAW, New York, New York, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Daniel Braxton, the Warden of Sussex I State Prison in Virginia (the "Warden"), appeals from the district court's order granting the motion of Brian Lee Cherrix, a death row inmate seeking federal habeas relief, for preservation and deoxyribonucleic acid ("DNA") retesting of the prosecution's evidence in his capital murder case. Alternatively, the Warden, along with Mark L. Earley, Attorney General for Virginia, and Samuel H. Cooper, Clerk of the Accomack County Circuit Court (collectively, the "Commonwealth"), seeks a writ of mandamus to compel the court to vacate its order. For reasons explained below, we dismiss the Warden's interlocutory appeal for lack of jurisdiction, and we deny the Commonwealth's petition for extraordinary relief as unjustified.

I.

A.

Cherrix was sentenced to death for the January 27, 1994 capital murder of Tessa Van Hart.[1] Van Hart, then twenty-three, was sodo-

---

[1]Cherrix was also convicted of forcible sodomy, using a firearm in the commission of a felony (two counts), and possessing a firearm after being convicted of a felony, all arising from the same incident.

mized and shot twice in the head after being dispatched for a pizza delivery on Chincoteague Island. *See Cherrix v. Commonwealth*, 513 S.E.2d 642, 645-46 (Va. 1999) (setting forth a detailed factual history of the crime). Her murder went unsolved for more than two years. On June 3, 1996, while Cherrix was incarcerated in the Accomack County Jail on unrelated charges, he offered to share information with police about the Van Hart murder in exchange for leniency with respect to his pending sentencing. Cherrix initially told authorities that his cousin, Robert Birch, III, had divulged to Cherrix in February 1994 that Birch had killed Van Hart — first luring her to an unoccupied residence by ordering a pizza, then raping and shooting her, and finally ditching his gun in a nearby creek.

Birch, who had died in 1995, was ruled out as a suspect. However, when Cherrix led investigators to the spot in the creek where Birch had supposedly told him the murder weapon was discarded, divers searching that location recovered a .22 caliber Marlin rifle. (This gun's patterns were consistent with the bullets recovered from Van Hart's body, although the prosecution's firearms experts could not identify this rifle specifically as the murder weapon.) Cherrix occasionally lapsed into use of the first person in describing how and where the gun ended up in the creek. Moreover, later the day the gun was recovered, during a police interview, Cherrix gave several differing versions of Birch's alleged disclosures, and he used hand and arm gestures to demonstrate how Birch had purportedly claimed to have dumped the rifle. Then, on April 16, 1997, while being transported back to Accomack County Jail on still different charges, Cherrix told police yet another version of Birch's supposed description of the murder. Finally, according to authorities, on April 25, 1997, Cherrix orally confessed to Edward Lewis, Chincoteague's Assistant Police Chief, that he, Cherrix, had murdered and sodomized Van Hart. Accompanied to Chincoteague by Lewis and an Accomack County Sheriff's Deputy, Cherrix then pointed out various spots that he had described in his confession.

1.

Cherrix's confession was reduced to handwriting by Lewis, purportedly as dictated by Cherrix, who later refused to sign it. The Commonwealth emphasizes that Cherrix has variously, and inconsistently,

suggested that his confession was false, inaccurately transcribed, coerced, and obtained in violation of his right to counsel. Cherrix counters that even if he did confess, it is not unprecedented for an accused to confess to a crime that he did not actually commit.

According to Cherrix, the only evidence connecting him to Van Hart's murder, other than his confession, was the .22 caliber Marlin rifle. Witnesses testified at trial that Cherrix had owned just such a gun, that he no longer possessed it several days after the crime, and that his gun had a broken, taped stock like the rifle recovered from the creek. There was also testimony, however, that Cherrix's gun had a squirrel carved on the stock. There is no indication in the record that the rifle recovered from the creek bore such a carving.[2]

Cherrix pleaded not guilty to the charges against him, presenting an alibi defense at trial. Cherrix maintained that, at the time Van Hart was killed, he was caring for his six-week-old daughter at his grandmother's home while speaking on the telephone with his wife, who had undergone an emergency appendectomy earlier that day. This defense was refuted at trial by Cherrix's then-estranged wife, who testified that Cherrix did not call her at the hospital until after 9 o'clock that night — outside the window of time in which Van Hart's murder occurred. The alibi was supported, however, by Cherrix's grandmother, who testified that the phone call occurred at about 8 o'clock or 8:15. In state habeas proceedings, Cherrix presented additional evidence that it had been the hospital's policy to terminate all patient telephone conversations at 9 o'clock.

---

[2]The Commonwealth maintains that the lack of reference in the record to any squirrel carving on the rifle recovered from the creek supports the inference that there was such a carving on that gun; Cherrix contends, conversely, that the record's silence suggests that no such carving was evident. The Commonwealth responded at oral argument that if the suspected murder weapon did not bear a squirrel carving, this marking must have eroded from the rifle after "years and years and years" in the saltwater creek. Actually, the rifle was recovered from the creek only two years after the murder. And it is unclear, in any event, what effect the saltwater might have had on the gun's wooden stock.

2.

In 1994, some two years before Cherrix's confession, DNA testing was conducted on seminal fluid collected from Van Hart's anus. In conjunction with her autopsy, the medical examiner divided the material taken from her body into spermatozoa and non-spermatozoa fractions, which were then subjected to a type of DNA analysis termed polymerase chain reaction ("PCR") testing. The non-spermatozoa fractions were consistent with the DNA collected from Van Hart. Due to an inability to amplify the spermatozoa fractions, however, the PCR test results on those fractions were inconclusive.

In authorizing the DNA retesting now in dispute, the district court acknowledged that, because the prosecution's theory of the case at trial was that a lone assailant murdered and sodomized Van Hart, it is reasonable to infer that the person whose seminal fluid was recovered from Van Hart's anus is her killer. The court also recognized that DNA technology has advanced since the PCR tests were conducted in this case in 1994, and that, according to Cherrix, the newer short tandem repeat ("STR") and mitochondrial tests can conclusively identify the donor of the seminal fluid by evaluating substances other than spermatozoa, such as epithelial cells and white blood cells.[3]

B.

This is the first time in any proceeding that Cherrix has requested DNA retesting. Previously, the Supreme Court of Virginia upheld Cherrix's convictions and death sentence on direct appeal, conclud-

---

[3]The Commonwealth has continued to maintain, through oral argument, that it has no plans to voluntarily retest the evidence. In fact, Cherrix initially sought DNA retesting in the state laboratory, but the Commonwealth refused this request. The district court then authorized testing in a private laboratory.

Moreover, though a new Virginia statute provides for DNA testing in certain cases, *see* S. 1366, 2001 Sess. (Va. 2001) (enacted), it is not clear whether Cherrix qualifies for retesting under this measure. According to the district court, "this legislation comes too late for this habeas petitioner, and the federal court is his last resort." *Cherrix v. Braxton*, 131 F. Supp. 2d 756, 787 (E.D. Va. 2001).

ing, inter alia, that his confession was admissible, *see Cherrix*, 513 S.E.2d 642, and the court subsequently denied Cherrix's request for rehearing. The Supreme Court of the United States then denied his petition for a writ of certiorari. *See Cherrix v. Virginia*, 528 U.S. 873 (1999). Cherrix filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on December 3, 1999, which the court dismissed on April 4, 2000.

Following the state supreme court's denial of rehearing on June 9, 2000, the trial court scheduled Cherrix's execution for August 16, 2000. The day before, however, the district court for the Eastern District of Virginia stayed Cherrix's execution and granted his motion for appointment of counsel.

1.

Prior to filing his federal petition for a writ of habeas corpus, Cherrix moved the district court for DNA retesting of the seminal fluid collected from Van Hart's body. While this motion was pending, Cherrix filed another motion for the retention and preservation of evidence, asking the court to order ten separate state agencies to preserve the evidence pertaining to Van Hart's murder and Cherrix's prosecution. The Warden objected to the court ordering any state agencies to act. On December 12, 2000, the district court conditionally granted Cherrix's motion for the retention and preservation of evidence, directing the Commonwealth to preserve all evidence, including any bodily fluids collected from Van Hart.

Cherrix then filed his petition in the district court for a writ of habeas corpus on December 28, 2000. The court subsequently authorized funding of DNA retesting and directed the Commonwealth to make the requisite evidence available for analysis. *See Cherrix v. Taylor*, No. 00-1377 (E.D. Va. Jan. 9, 2001) ("January 9, 2001 Order"). The following day, the court denied the Warden's oral motion to stay this order, ruling that the Warden had set forth no basis for his request. That same day, the Commonwealth filed in this Court: (1) an application for an emergency stay of the January 9, 2001 Order; (2) a Petition for a Writ of Mandamus and/or Prohibition; and (3) the Warden's appeal of the January 9, 2001 Order. On February 5, 2001,

we granted the Commonwealth's application for an emergency stay pending appeal.

Pursuant to Rule 21(b)(4) of the Federal Rules of Appellate Procedure, we invited the district court to submit a response to the petition for a writ of mandamus. The district court responded, on February 28, 2000, with a seventy-five-page supplemental memorandum opinion. *See Cherrix v. Braxton*, 131 F. Supp. 2d 756 (E.D. Va. 2000) ("Supplemental Opinion"). Therein, the court "clarif[ies] and reaffirm[s]" its nine-page January 9, 2001 Order. *See id.* at 759.[4]

2.

In its Supplemental Opinion, the district court expounded that its January 9, 2001 Order "granted the habeas petitioner's request for funds, and ordered that the custodians of the evidence make it available for testing, for three reasons." *Cherrix*, 131 F. Supp. 2d at 759. First, the court determined that it was authorized, pursuant to 21 U.S.C. § 848(q), to provide funding for services which are reasonably necessary to support a petition for habeas corpus. Second, the court concluded that DNA retesting is reasonably necessary to support Cherrix's claims of actual innocence, *see Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming without deciding "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial

---

[4]The Commonwealth contends that we should not consider this Supplemental Opinion because, in part, it "appears to be just a *post facto* attempt to justify its January 9 action on entirely new grounds which were . . . entirely omitted from the district court's January 9 order." Reply in Support of Petition for Writ of Mandamus, at 15. We reject the assertion that the Supplemental Opinion should not be considered, because this submission was filed at our request and aids us in our consideration of not only the Commonwealth's mandamus petition, but also the Warden's appeal. *See* Fed. R. App. P. 21(b)(4) ("The court of appeals may invite or order the trial-court judge to address the petition [for a writ of mandamus.]"); *In re Grand Jury Proceedings Under Seal*, 947 F.2d 1188, 1199 (4th Cir. 1999) ("[A] district court does not lose jurisdiction to proceed as to matters in aid of the appeal."). Moreover, though the Supplemental Opinion is certainly more detailed than the January 9, 2001 Order, these documents do not, as the Commonwealth contends, conflict with each other.

would render the execution of a defendant unconstitutional"), and innocence as a "gateway" to proving other constitutional claims, *see Schlup v. Delo*, 513 U.S. 298, 327 (1995) (permitting a habeas petitioner to show that a constitutional violation probably resulted in his conviction, despite his innocence, by establishing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence"), as well as a potential clemency petition. Third, the court ruled that Cherrix showed good cause for DNA retesting, entitling him to discovery pursuant to Rule 6(a) of the Rules Governing § 2254 Cases and 28 U.S.C. § 2254(2)(A)(ii), (2)(B).

Without passing on Cherrix's claims of innocence, the district court determined that, at the very least, "the habeas petition raises disturbing questions regarding the constitutionality of Cherrix's trial proceedings that are heretofore unanswered." *Cherrix*, 131 F. Supp. 2d at 786. The court also recognized that

> [o]rdering a new DNA test has the potential of producing three different outcomes. First, the test can prove inconclusive, in which case no newly-discovered evidence would be before the Court, and the *Herrera* inquiry [and, relatedly, the *Schlup* inquiry,] would be futile. Second, the test results can show that Cherrix sodomized Ms. Van Hart and deposited the seminal fluid into her body, in which case the evidence would moot his claims of innocence. Third, the test results can show a third party deposited the seminal fluid into Ms. Van Hart's body. If the test results implicate a third party, then the issue would be placed before the Court of whether such evidence, coupled with other allegations of constitutional error, would be sufficient to grant Cherrix federal habeas relief. However, the DNA evidence must first be brought before the Court in discovery prior to consideration of the habeas corpus petition on the merits.

*Id.* at 765-66 (internal citations omitted).

## II.

The Warden asks us, first, to reverse the district court's January 9, 2001 Order pursuant to an exercise of our jurisdiction under 28

U.S.C. § 1292(a)(1) (providing "jurisdiction of appeals from [i]nterlocutory orders of the district courts of the United States . . . granting injunctions"). Alternatively, the Commonwealth seeks a writ of mandamus, under the All Writs Act, 28 U.S.C. § 1651, compelling the district court to vacate its order.[5]

We cannot overemphasize the extraordinary nature of the remedies sought here, stemming from the federal court system's longstanding disapproval of piecemeal appellate review. *See, e.g.*, *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 25 n.3 (1966) (recognizing that interlocutory review of pretrial orders is "an intolerable burden for us, an improper and uncertain interference with trial court discretion, and a confusing invitation to indiscriminate appeals in the future") (quoting *Peter Pan Fabrics, Inc. v. Dixon Textile Corp.*, 280 F.2d 800, 806 (2d Cir. 1960) (Clark, J., dissenting)); *Will v. United States*, 389 U.S. 90, 95 (1967) (acknowledging that "only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of" the writ of mandamus, an "extraordinary remedy").

## A.

We first address whether, pursuant to 28 U.S.C. § 1292(a)(1), we possess jurisdiction over the Warden's appeal from the district court's January 9, 2001 Order. This order, the Warden insists, "has the practical effect of an injunction in that it commands specific conduct from

---

[5]The Commonwealth captioned its pleading as a "Petition for a Writ of Mandamus and/or Prohibition." Because the terms "mandamus" and "prohibition" have come to be used interchangeably with regard to writs, we will, for the sake of simplicity, refer to the Commonwealth's petition as one seeking a writ of mandamus. *See, e.g.*, *In re Sch. Asbestos Litig.*, 921 F.2d 1310, 1313 (3d Cir. 1990) ("Although a writ of mandamus may appear more appropriate when the request is for an order mandating action, and a writ of prohibition may be more accurate when the request is to prohibit action, modern courts have shown little concern for the technical and historic differences between the two writs. Under the All Writs Act, the form is less important than the substantive question of whether an extraordinary remedy is available.") (internal citations, quotation marks, and alteration omitted).

the Warden, Attorney General and Clerk of the trial court." Appellant's Br., at 11. Moreover, the Warden emphasizes, failure to comply with the order is punishable by contempt.

However, a non-final order generally is not subject to interlocutory appeal under § 1292(a)(1) if it is not directed to the merits of the underlying action. *See, e.g.*, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988) ("An order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)."); *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 973 (4th Cir. 1979) (holding that where "[t]he district court's order . . . regulates the conduct of discovery" and, thus, "is merely a step in the litigation process and is in no way directed to the merits of the underlying action[,] . . . the order is not appealable under § 1292(a)(1)"). It is irrelevant to this analysis that a violator of the order may be held in contempt. *See United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 507 (4th Cir. 1999) ("[A]n order compelling discovery involves an interlocutory command that may be subject to the contempt power of the court, yet such an order is not thought to be cognizable under § 1292(a)(1).").

In this case, the district court's January 9, 2001 Order allows Cherrix to engage in discovery potentially supportive of his habeas petition, while recognizing that, even if the results of the DNA retesting exclude Cherrix as the semen donor, he still is not necessarily entitled to relief. As the court explained in its Supplemental Opinion, "The new DNA testing methods *could possibly* procure conclusive evidence demonstrating that a third person committed the murder and sodomy which *may* ultimately exonerate the habeas petitioner of capital murder." *Cherrix*, 131 F. Supp. 2d at 759 (emphasis added); *see also id.* at 786 ("This Court was called upon to make a judgment about the reasonable necessity of DNA testing services to a condemned habeas petitioner's case. This Court made no proclamation or judgment about Cherrix's claims of innocence."). Clearly, the January 9, 2001 Order is just a step in the litigation process that is not directed to the merits of the underlying habeas action. At this juncture, the district court has not yet even been presented with the question of the admissibility of the DNA retesting results.

Nonetheless, an interlocutory order may be appealable pursuant to § 1292(a)(1) if the appellant "can show that [this order] of the district court might have a 'serious, perhaps irreparable, consequence,' and that the order can be 'effectually challenged' only by immediate appeal[.]'" *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981); *see also Gulfstream Aerospace*, 485 U.S. at 287-88 (recognizing that this analysis applies to "orders that have the practical effect of granting or denying injunctions"); *Oncology Assocs.*, 198 F.3d at 507 (same).

1.

The Warden maintains that the "serious, perhaps irreparable, consequences" of permitting the DNA testing to go forward include: (1) "the potential destruction of the Commonwealth's evidence"; (2) "a guaranteed loss of the chain of custody"; (3) "the undeniable damage to federalism and finality that has 'special importance' in the context of federal review of state court convictions"; and (4) "an opening of the floodgates to a host of similar ill-advised demands upon the federal district courts." Appellant's Br., at 12-13. We address these purported consequences in turn.

First, the Warden's concern about destruction of the evidence is, at best, premature. As the district court made clear, its January 9, 2001 Order

> did not provide for the final testing of the evidence, only for its preservation and for testing funds. At the time of the Court's January 9 Order — and presently — the Court intended to conduct a hearing to determine how the DNA testing would proceed. The Court expected both the Commonwealth and the parties to participate in structuring conditions for the testing of the requested evidence in order to protect the integrity of the evidence and to ensure equal access to all parties.

> The procedure the Court adopts for the analysis of the evidence will address the Petitioners' concern that Cherrix may consume the remaining forensic evidence and that the integrity of the evidence be maintained.

*Cherrix*, 131 F. Supp. 2d at 771-72 (internal citations omitted). Indeed, the district court went on to discuss at length the procedural issues related to post-conviction DNA testing identified in a 1999 report sponsored by the Attorney General of the United States,[6] including the type of DNA analysis to be utilized, the choice of laboratory to perform the testing, and the amount of sample to be available for testing and replicate testing. *See id.* at 772-73.

Furthermore, even if the Commonwealth's supposition were realized and the evidence were destroyed, it is doubtful that harm would flow to anyone other than Cherrix. That is, as Cherrix aptly points out, he

> already stands convicted and condemned, and the Commonwealth does not need the biological evidence in order to carry out his death sentence. . . . [This] evidence has been sitting in some storage box(es) for years, and that is where it will remain, untested and unused, unless the [Commonwealth] is compelled to make it available.

Appellee's Br., at 15. The Warden counters that, if the evidence is consumed during retesting, the Commonwealth might lose the ability to use it "on retrial if necessary or during clemency proceedings." Appellant's Reply Br., at 7. The Warden does not explain, however, how this would lead to irreparable harm to the Commonwealth, i.e., why it would need the evidence for even more retesting. Most significantly, the district court has stated its intention to protect the evidence's integrity and to conduct the DNA testing in an objective manner with the participation of all parties. If the evidence is depleted during this testing, these results could be used — or challenged — by the Commonwealth upon any retrial or clemency proceeding.

Second, and similarly, with regard to the custody of the evidence to be retested, the district court declared that it "fully intends to impose procedures to protect the chain of custody when the Court actually orders that the evidence be moved to permit the DNA testing." *Cherrix*, 131 F. Supp. 2d at 772 n.13 (citing for comparison *In*

---

[6]*See* National Commission on the Future of DNA Evidence, Postconviction DNA Testing: Recommendations for Handling Requests (1999).

*re Warden, Kentucky State Penitentiary v. Gall*, 865 F.2d 786, 788 n.1 (6th Cir. 1989) (stating that mandamus petitioner's fears regarding integrity of evidence and chain of custody appeared to be "vastly overblown" because petitioner was free to send representative to monitor retesting, and petitioner could argue the vitiating effects of time if retesting produced different results)).

In support of his third purported consequence, the "undeniable" damage to, in particular, the finality of state court convictions, the Warden relies on the Supreme Court's decision in *McCleskey v. Zant*, 499 U.S. 467, 491 (1991). In *McCleskey*, during a discussion of the doctrines of procedural default and abuse of the writ, the Court illuminated the potential risks of reexamining state convictions on federal habeas review. Though we recognize the ramifications of, inter alia, granting a habeas petitioner a new trial, we fail to comprehend how *McCleskey* supports the Warden's challenge to an interlocutory order that has only the potential to someday upset the finality of Virginia's conviction of Cherrix. Moreover, as the district court acknowledged, "[T]his Court, by statute [28 U.S.C. § 2254], has the duty to examine actions taken by the Commonwealth to make sure that the final result obtained is one in keeping with Cherrix's constitutional rights." *Cherrix*, 131 F. Supp. 2d at 784; *see also id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 323 (1979) for the proposition that "[a]lthough the notion of 'finality' is important, such finality is not desirable when the result is the 'finality' of the deprivation of liberty at the expense of a constitutional right").

Finally, though the Warden asserts that the district court's January 9, 2001 Order will "open the floodgates" to similar requests, he offers no support for this stark assertion. Moreover, he fails to explain how, if there were an influx of motions for DNA testing and preservation of evidence in the district courts, this would result in "serious, perhaps irreparable consequences," where the courts presumably would dispose of the motions on their merits in the regular course of business.

2.

In next addressing why the January 9, 2001 Order can be "effectually challenged" only by immediate appeal, the Warden asserts that "[a]bsent an immediate appeal, the Commonwealth will have to turn

over its evidence [ ] with all the dangers attendant to that action[.]" Appellant's Br., at 14. We are not at all persuaded by this contention, which merely revisits the purported "serious, perhaps irreparable" consequences of tendering the evidence. If a discovery order could be challenged under § 1292(a)(1) any time there was the remotest possibility, despite the best efforts of the issuing court, that evidence could be destroyed or the chain of custody broken, we would be inundated with the very piecemeal appeals that our system so disfavors. In essence, the Warden asks us to rewrite the rules for appellate review of interlocutory orders so that "almost every pretrial . . . order might be called 'effectually unreviewable' [on appeal from final judgment] in the sense that relief from error can never extend to rewriting history." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 872 (1994).[7] This we are unwilling and unable to do.

Rather, we are constrained to agree with Cherrix that the propriety of the district court's January 9, 2001 Order can be adequately reviewed on appeal from final judgment. If, for example, the district court awards habeas relief to Cherrix based on the findings of the

---

[7]The Warden also objects to providing evidence "in furtherance of Cherrix's frivolous and legally impossible free-standing claim of actual innocence." Appellant's Br., at 14. The Warden relies on our unpublished order in *Poyner v. Murray*, No. 93-6052 (4th Cir. Jan. 19, 1993), reversing the district court's eleventh-hour decree permitting Poyner's expert to observe the autopsy of and collect brain tissue samples from an executed inmate in support of Poyner's habeas claim that execution by electrocution was cruel and unusual punishment. In *Poyner*, because it was already well-settled that electrocution was not an unconstitutional means of execution, we reversed the discovery order on the ground that "the basic premise in the underlying case in the district court is entirely without merit." *Poyner*, No. 93-6052, at 5. This decision is not helpful to the Warden, however, for several reasons. First, it is an unpublished order of no precedential value. *See* Local Rule 36(c). Second, and more importantly, even assuming that the appealability of a discovery order under § 1292(a)(1) can depend on whether the underlying claim is cognizable, the Warden attacks only one of Cherrix's grounds for habeas relief. That is, though the Warden is correct insofar as he asserts that actual innocence alone is not a colorable ground for such relief in our Circuit, he fails to acknowledge that Cherrix also asserts other, cognizable bases for relief. *See infra*, Part II.B.

DNA analysis, the Warden may appeal that decision on the ground that, inter alia, the retesting was unlawfully authorized by the court. This same contention may also be proffered by the Warden if Cherrix appeals the denial of habeas relief.

In summary, because the Warden has failed to establish that the district court's January 9, 2001 Order might have "serious, perhaps irreparable, consequences," and because this order cannot be "effectually challenged" only by immediate appeal, we must dismiss the Warden's appeal for lack of § 1292(a)(1) jurisdiction.[8]

### B.

We now consider whether the Commonwealth is entitled to a writ of mandamus, pursuant to the All Writs Act, 28 U.S.C. § 1651, directing the district court to vacate its January 9, 2001 Order. The Commonwealth maintains that the district court lacked authority to: (1) direct the Commonwealth, pursuant to 21 U.S.C. § 848(q), to make its evidence available for DNA retesting;[9] (2) authorize funding under § 848(q) for investigation of Cherrix's *Herrera* claim, *see supra* Part I.B.2, because we do not recognize free-standing habeas claims of actual innocence where, as in Virginia, state clemency proceedings are available, *see Royal v. Taylor*, 188 F.3d 239, 243 (4th Cir. 1999); (3) order DNA retesting in support of any *Schlup* claims, *see supra*

---

[8]Because we dismiss this appeal for lack of jurisdiction, we decline to address Cherrix's assertion that the Warden lacked standing to bring the appeal.

[9]The basic premise of this contention — that the district court actually relied on § 848(q) for authority to direct the Commonwealth to proffer the evidence for analysis — is belied by the court's January 9, 2001 Order and its Supplemental Opinion. The order plainly cites the Federal Rules of Civil Procedure, as applicable through the Rules Governing § 2254 Cases, and constitutional principles as authority for ordering the retention and preservation of evidence. Moreover, the court referenced § 848(q) for only the specific conclusion that Cherrix was entitled to funding for DNA testing. In its Supplemental Opinion, the court reiterates that it relied on § 848(q) solely to authorize funding for this analysis. In the alternative, the Commonwealth insists that no authority supports the court's discovery order.

Part I.B.2, before the Warden had an opportunity to respond to Cherrix's habeas petition and assert the defense of procedural default; and (4) grant Cherrix's request for DNA analysis in spite of his failure to request such testing in state court.

The party seeking a writ of mandamus must satisfy the conditions of a rigorous test, demonstrating each and every one of the following requirements:

> (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances.

*Oncology Assocs.*, 198 F.3d at 511 (citing, inter alia, *Kerr v. United States Dist. Court*, 426 U.S. 394, 403 (1976) (recognizing that, in order to ensure "the writ will issue only in extraordinary circumstances, . . . the party seeking issuance of the writ [must] have no other adequate means to attain the relief" sought)).

The Commonwealth faces the same problem in seeking a writ of mandamus that the Warden faced in bringing an interlocutory appeal — other adequate means exist to attain the relief it desires. That is, the district court's January 9, 2001 Order may be reviewed on appeal from final judgment, with no conceivable risk of harm to the Commonwealth. We have consistently held, as we are constrained to do today, that we will not issue a writ of mandamus under such circumstances. *See, e.g.*, *In re Catawba Indian Tribe of South Carolina*, 973 F.2d 1133, 1137 (4th Cir. 1992) (denying a writ of mandamus to compel the district court to grant a class certification where the issue was reviewable on appeal from final judgment); *In re Int'l Precious Metals Corp.*, 917 F.2d 792, 792, 794 (4th Cir. 1990) (declining to issue a writ requiring the district court to transfer the case in order to enforce a forum selection clause, because the petitioner could "appeal the . . . court's denial of transfer after final judgment"). Moreover, we are cognizant of the potential danger in permitting a party to use a petition for a writ of mandamus as an end-run around our appellate rules. *See Catawba Indian Tribe*, 973 F.2d at 1135 ("The very power

of the writ of mandamus demands that its availability be limited to narrow circumstances lest it quickly become a shortcut by which disappointed litigants might circumvent the requirements of appellate procedure mandated by Congress."); *see also id.* at 1137 (acknowledging that "[w]e must be reluctant indeed" to permit the petitioner from accomplishing by mandamus that which is prohibited by interlocutory appeal). Therefore, we deny the Commonwealth's mandamus petition.[10]

### III.

For all of the foregoing reasons, we dismiss the Warden's interlocutory appeal for lack of jurisdiction, and we deny the Commonwealth's petition for a writ of mandamus.[11]

*APPEAL DISMISSED*
*AND PETITION FOR MANDAMUS DENIED*

TRAXLER, Circuit Judge, concurring:

I concur in the results reached in the opinion of my friend Judge King. I write separately because my reasoning is somewhat different.

### I.

This appeal began with Cherrix's motion for an order, *solely under the authority of 21 U.S.C. § 848(q)*, directing the Commonwealth to

---

[10]Because the Commonwealth has other adequate means to challenge the January 9, 2001 Order, i.e., appeal from final judgment on Cherrix's habeas petition, we need not address the other prongs of the test for issuing a writ of mandamus. Likewise, we do not consider Cherrix's contention that the Commonwealth lacked standing to seek the writ.

[11]Accordingly, we lift our stay of the January 9, 2001 Order. We also dispose of the following pending motions in this case: (1) we deny the Warden's motion for expedition of the adjudication of this case, as it had already been placed on an expedited briefing and argument schedule; (2) we deny his motion for reconsideration of the Clerk's Order of June 11, 2001, filing under seal certain supplemental authority submitted by Cherrix; and (3) we grant Cherrix's unopposed motion to amend his brief.

make the seminal fluid available for DNA retesting. At the time of the motion, Cherrix had yet to file a petition for relief under § 2254. After a hearing on the merits of the motion filed by Cherrix, and after Cherrix filed his petition for relief under § 2254, the district court issued its January 9, 2001 Order which granted the motion. In my estimation, the legal basis for this order directing retesting of the evidence was not particularly clear; by contrast, it was clear that the court was granting funding pursuant to § 848(q). Indeed, although the January 9, 2001 Order contained a general citation to Rule 11 of the Rules Governing Section 2254 Cases, the district court appeared to draw its authority to direct the Commonwealth in this regard primarily from § 848(q), a statute aimed at providing adequate legal services for indigent capital defendants. Given the language of the January 9, 2001 Order and the fact that § 848(q) was the sole basis for Cherrix's motion, the Commonwealth's belief that the district court acted beyond its power is understandable. And, apart from the substantial legal questions regarding the propriety of retesting in the first place, the order was of substantial concern to the Commonwealth because in very general terms it ordered the assistant attorney general and the state clerk of court to "make available to Petitioner any bodily fluids or swabs seized from Tessa Van Hart, or the Petitioner for testing to the laboratory as directed by the Court." The Commonwealth feared a loss of the chain of custody and contamination or destruction of this evidence. The January 9, 2001 Order did not incorporate any safeguards that would diminish these risks.

In light of these concerns, the Commonwealth immediately appealed the district court's order under 28 U.S.C.A. § 1292(a)(1), while at the same time petitioning this court for a writ of mandamus to "vacate the district court's January 9th order entered pursuant to 21 U.S.C. § 848(q) directing state officials to locate, preserve and turn over for DNA testing bodily fluids taken from the victim and Cherrix."

Under Rule 21(b)(4) of the Federal Rules of Appellate Procedure, we invited the district court to submit a response to the Commonwealth's petition for a writ of mandamus. This rule provides as follows:

> The court of appeals may invite or order the trial-court judge to address the petition or may invite an amicus curiae to do

so. The trial-court judge may request permission to address the petition but may not do so unless invited or ordered to do so by the court of appeals.

We thereafter received from the district court a very detailed statement expanding upon the factual bases and the legal reasoning for its decision ("the Supplemental Opinion"). In the Supplemental Opinion, the district court explained that it was not issuing its order solely under the authority of 21 U.S.C. § 848(q), stating that its order directing DNA re-testing was issued pursuant to the "good cause" standard contained in Habeas Rule 6(a). Unlike the January 9, 2001 Order, the Supplemental Opinion identified various protective measures the district court intended to employ to maintain the physical integrity of the evidence and safeguard the chain of custody.

Were it not for the information in the Supplemental Order, however, I would hold that the January 9, 2001 Order, standing alone, was immediately appealable. Without clarification from the Supplemental Opinion, the January 9, 2001 Order, literally interpreted, required the Commonwealth to turn over the samples directly to the defendant for testing. This would have broken the chain of custody and created a situation, if only in testing, in which Cherrix could have contaminated and even destroyed the evidence. In my judgment, the dangers attendant to an apparently uncontrolled release of the evidence would have fully warranted an interlocutory appeal and would have mandated our intervention.

The Commonwealth urges us not to consider the Supplemental Opinion on the grounds that the district court essentially amended its opinion and substituted new legal grounds for its conclusions, even after we had granted the Commonwealth a stay pending appeal. Considering the fact that this panel specifically invited the district court to address the Commonwealth's petition for a writ of mandamus, it would be strange indeed if the district court overstepped its bounds by doing just that. Furthermore, although Appellate Rule 21(b)(4) pertains only to "Writs of Mandamus and Prohibition, and Other Extraordinary Writs," I believe that it is appropriate for us to consider the Supplemental Opinion with respect to the Commonwealth's appeal under 28 U.S.C. § 1292(a)(1) as well. As Judge King explained, the district court retained jurisdiction to act on matters "in

aid of the appeal." *Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 890 (4th Cir. 1999) (internal quotation marks omitted); *In re Grand Jury Proceedings Under Seal*, 947 F.2d 1188, 1190 (4th Cir. 1991). This principle is based on notions of judicial economy and efficiency. *See id.* We considered the mandamus issue simultaneously with the appeal question, and thereby had before us the Supplemental Opinion. We now understand the district judge has considered a number of safeguards that he intends to implement in order to protect the evidence. It makes little sense to consider the Supplemental Order for purposes of resolving the petition for a writ of mandamus but then close our eyes to it concerning whether review is available under 28 U.S.C.A. § 1292(a)(1). I believe the information in the Supplemental Order should be considered if for no other reason than because, as a practical matter, it answers the questions of the Commonwealth and assures that the handling of this evidence will be commensurate with the needs of both parties.

In light of the Supplemental Opinion, I am satisfied the order of the district court will not result in "serious, perhaps irreparable, consequence" and I do not believe that the order can be "effectually challenged" only by an immediate appeal. *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981) (internal quotation marks omitted). Thus, the Commonwealth is not entitled to immediate review.

## II.

Likewise, I concur that the Commonwealth is not entitled to a writ of mandamus. In addition to the reasons stated by Judge King, mandamus relief is not appropriate because the district court was acting on a matter entrusted to its discretion. As the majority opinion rightly points outs, the relief provided by the issuance of a writ of mandamus is extraordinary in nature, and I agree the Commonwealth is not entitled to it. The traditional use of the writ of mandamus has been "to confine an inferior court to a lawful exercise of its prescribed jurisdiction." *Kerr v. United States Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 402 (1976) (internal quotation marks omitted). Although writs of mandamus or prohibition may of course be employed to compel or prohibit action by those outside of the judiciary, such as executive agencies or officials, *see United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 502, 515 (4th Cir. 1999) (affirming in part the issu-

ance of a writ of mandamus to the Health Care Financing Administration), additional concerns arise when mandamus relief is sought against a lower court, particularly when it is sought in conjunction with an ongoing case.

Perhaps the most obvious concern in this context is that parties will use a writ of mandamus as a surrogate for the appellate process. *See Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 382-83 (1953). Even if the district court issues an interlocutory order that is wrong on the merits and that results in substantial inconvenience, something more is required to justify mandamus relief. If not, "then every interlocutory order which is wrong might be reviewed under the All Writs Act" and the function of the writ of mandamus "would be enlarged to actually control the decision of the trial court rather than used in its traditional function of confining a court to its prescribed jurisdiction." *Id.* at 383. The other major reason that mandamus relief is discouraged in the context of ongoing litigation is that such petitions tend to pit the petitioner and the district court against each other. In essence, the district court becomes a litigant, cast in an adversarial role against the mandamus petitioner, who remains a litigant in the pending lawsuit. *See Kerr*, 426 U.S. at 402.

Accordingly, a mandamus petitioner can show he is entitled to the writ only by demonstrating the lower court committed a "clear abuse of discretion or conduct amounting to usurpation of the judicial power." *Mallard v. United States Dist. Ct. for the S. Dist. of Iowa*, 490 U.S. 296, 309 (1989) (internal citations, alterations and quotation marks omitted). And, as Judge King makes clear, even if the petitioner can demonstrate an abuse or usurpation of judicial power, there are additional hurdles to make certain that mandamus relief is available only in extraordinary circumstances: there must be no "adequate alternative means to obtain the relief" sought in the mandamus petition and the "right to issuance of the writ [must be] clear and indisputable." *Id.* (internal quotation marks omitted).

It is substantially more difficult to demonstrate the court usurped power beyond its authority when the mandamus petition is directed at a matter committed to the discretion of the district court. *See In re Catawba Indian Tribe of South Carolina*, 973 F.2d 1133, 1136 (4th Cir. 1992) (en banc). Almost by definition, a court that is deciding a

matter within its discretion is acting within its prescribed authority, even if the court technically makes the wrong decision. Thus, "[t]he writ of mandamus is not to be used when the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction." *Schlagenhauf v. Holder*, 379 U.S. 104, 112 (1964) (internal quotation marks omitted).

The Supplemental Opinion indicates that the court granted only Cherrix's request for funding pursuant to 21 U.S.C. § 848(q), but that it ordered the Commonwealth to make the forensic evidence available for testing for "good cause" under Habeas Rule 6(a). Rule 6(a) permits a party "to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so." The district court's decision to permit or deny the discovery of evidence under Rule 6(a) is clearly an exercise of the court's discretion. Even if the court erroneously determined that "good cause" exists, the court has merely "erred in ruling on [a] matter[ ] within [its] jurisdiction," *Schlagenhauf*, 379 U.S. at 112 (internal quotation marks omitted), and mandamus relief is not available.

Again, it bears noting that, in my view, the Commonwealth's belief that the district court acted beyond its power was not entirely misplaced, especially before the district court issued its Supplemental Opinion. Indeed, the January 9, 2001 Order does not specifically cite Rule 6(a) and it does not use the phrase "good cause," although it does contain a general reference to the applicability of the Federal Rules of Civil Procedure through Habeas Rule 11. And, Cherrix's motion for DNA retesting and for funding to accomplish the retesting was made entirely under the auspices of § 848(q), not Habeas Rule 6(a). Indeed, at the time that Cherrix filed his motion, the district court would have had no authority to grant it under Rule 6 because Cherrix had not yet filed his § 2254 petition. Thus, prior to the issuance of the district court's Supplemental Opinion, the Commonwealth's belief that § 848(q) was the basis for the entire January 9, 2001 Order — not just the portions related to funding — was not unreasonable. Of course, § 848(q) may provide authority for the court to authorize the release of federal funds for services in conjunction with Cherrix's § 2254 petition, but it grants no authority whatsoever for a district court to issue a discovery-type order.

In the final analysis, however, if "good cause" does not support DNA retesting, the Commonwealth can have its concerns effectively addressed on appeal after the district court's decision on the merits has become final. I therefore concur that we cannot issue a writ of mandamus under the circumstances.